**OHIO ASSOCIATION OF CONSULTING ENGINEERS et al., Appellants,**

v.

**VOINOVICH et al., Appellees.**

[Cite as *Ohio Assn. of Consulting Engineers v. Voinovich* (1992), 83 Ohio App.3d 601.]

Court of Appeals of Ohio,
Franklin County.

No. 92AP–78.

Decided Nov. 10, 1992.

*Means, Bichimer, Burkholder & Baker, Richard W. Ross* and *Robert M. Morrow,* for appellants.

*Lee Fisher,* Attorney General, *Patrick A. Devine, Jerry K. Kasai* and *Ronald A. Snyder,* Assistant Attorneys General, for appellees.

BOWMAN, Judge.

Appellants in this matter are architects, landscape architects, engineers and surveyors, and their representative organizations and companies, who provide or seek to provide professional design services to the state of Ohio. Appellees are Ohio Governor George V. Voinovich, the Ohio Department of Administrative Services ("ODAS"), and the Ohio Department of Transportation ("ODOT").

The dispute centers upon the signing by the Governor, on September 3, 1991, of Executive Order 91–156V, an emergency order which adopted Ohio Adm.Code 153:2–1–01 through 2–1–06 and Ohio Adm.Code 153:2–2–01 through 2–2–06, and the incorporation of that emergency order into the Ohio Administrative Code. The rules were adopted in an effort to improve the procedure by which the state selects persons or entities to provide professional design services on public works projects.

By law, the order automatically would have expired ninety days after filing; however, a permanent version of the rules was filed September 23, 1991, with a proposed effective date of December 5, 1991. The Joint Committee on Agency Rule Review, after a public hearing, recommended that the General Assembly adopt a concurrent resolution invalidating the proposed rules. The House of Representatives adopted the proposed resolution, while the Senate refused to vote. Thus, the concurrent resolution failed. Consequently, under authority of R.C. Chapter 119, ODOT and ODAS have adopted and implemented the rules,

now codified as Ohio Adm.Code 153:1–1–01 through 1–1–06 and Ohio Adm.Code 153:2–1–01 through 2–1–06.

On October 3, 1991, appellants filed a complaint seeking declaratory and injunctive relief from the rules as adopted. During discovery, appellants served the Governor with a notice of deposition, seeking information and documents regarding the basis for the Governor's determination that a state of emergency existed justifying adoption of the Executive Order. On December 10, 1991, the trial court granted the Governor's office a protective order, precluding all discovery related to the Governor's determination that an emergency existed. Meanwhile, in November 1991, the parties filed cross-motions for summary judgment, upon which the trial court granted appellees' motion and denied appellants' motion for summary judgment on December 23, 1991.

Appellants now raise the following assignments of error:

"Assignment of Error No. 1:

"The trial court committed error by awarding summary judgment in behalf of the defendants. Summary judgment should have been awarded to the plaintiffs as a matter of law.

"Assignment of Error No. 2:

"The trial court erred when it determined that it would not review the unilateral declaration of an emergency by appellee Governor in the implementation of emergency rules without notice or hearing.

"Assignment of Error No. 3:

"The trial court abused its discretion in granting a blanket protective order for appellee Governor prohibiting the appellants from conducting any discovery of the Governor or representatives from his office."

Appellants argue that the rules, which provide part of the current procedure by which ODAS and ODOT select professional design services for public works projects, violate R.C. Chapter 153 by implementing competitive bidding as a method of determining the best firms for particular state projects. Appellants emphasize that they are only contesting subsections (C), (I), (J) and (K) of ODAS's permanent Rule 153:1–1–05 and ODOT's permanent Rule 153:2–1–05. Those subsections are substantively identical and provide as follows:

"(C) The committee shall issue a list of no fewer than three firms, and preferably five firms, rated qualified to perform the required services. Upon written notification to the director of [ODAS] [ODOT] or designee that fewer than three qualified firms are available, those firm(s) shall be selected.

" * * *

"(I) Upon written notification to the director of [ODAS] [ODOT] or designee that fewer than three qualified firms are available, those firm(s) shall be selected and ranked.

"(J) If one firm is determined to be most qualified, the committee shall notify the director of [ODAS] [ODOT], and shall ask the firm to submit a lump sum fee proposal. If more than one firm is determined to be equally most qualified, then each firm shall be asked to submit a lump sum fee proposal. The firm(s) may submit a revised technical proposal.

"(K) The firm submitting the lowest fee proposal shall be determined to be most qualified. A contract shall be negotiated with the firm ranked most qualified to perform the required services at a compensation determined, in writing, to be fair and reasonable to the state."

To summarize the rules, where more than one firm is properly found to be equally qualified to perform the project, those firms are offered the opportunity to submit a fee proposal. The "most qualified" firm then becomes the firm which submits the lowest fee proposal.

Appellants claim these rules contravene R.C. 153.69, which states:

"For every professional design services contract, each agency planning to contract for professional design services shall evaluate the statements of qualifications of professional design firms currently on file, together with those that are submitted by other professional design firms specifically regarding the project, and may hold discussions with individual firms to explore further the firms' statements of qualifications, the scope and nature of the services the firms would provide, and the various technical approaches the firms may take toward the project. Following this evaluation, the agency shall:

"(A) Select and rank no fewer than three firms which it considers to be the most qualified to provide the required professional design services, except when the agency determines in writing that fewer than three qualified firms are available in which case the agency shall select and rank those firms;

"(B) Negotiate a contract with the firm ranked most qualified to perform the required services at a compensation determined in writing to be fair and reasonable to the state. Contract negotiations shall be directed toward:

"(1) Ensuring that the professional design firm and the agency have a mutual understanding of the essential requirements involved in providing the required services;

"(2) Determining that the firm will make available the necessary personnel, equipment, and facilities to perform the services within the required time;

"(3) Agreeing upon compensation which is fair and reasonable, taking into account the estimated value, scope, complexity, and nature of the services."

This statute must be read in conjunction with R.C. 153.65(D), which defines "qualifications" as follows:

"(1) Competence of the professional design firm to perform the required professional design services as indicated by the technical training, education, and experience of the firm's personnel, especially the technical training, education, and experience of the employees within the firm who would be assigned to perform the services;

"(2) Ability of the firm in terms of its workload and the availability of qualified personnel, equipment, and facilities to perform the required professional design services competently and expeditiously;

"(3) Past performance of the firm as reflected by the evaluations of previous clients with respect to such factors as control of costs, quality of work, and meeting of deadlines;

"(4) Other similar factors."

Appellants' first assignment of error charges that the trial court erred in awarding summary judgment to appellees rather than to appellants because the court failed to apply the appropriate test for determining the validity of administrative rules. Summary judgment is only proper where the trial court, construing the facts in a light most favorable to the nonmovant, determines there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 8 O.O.3d 73, 375 N.E.2d 46.

According to appellants, had the court applied *Carroll v. Dept. of Adm. Serv.* (1983), 10 Ohio App.3d 108, 10 OBR 132, 460 N.E.2d 704, the court would have found that the rules impermissibly altered the statutorily prescribed manner in which ODOT and ODAS are required to rank and select the most qualified professional design firms.

In *Carroll*, this court recognized that:

" * * * The purpose of administrative rulemaking is to facilitate the administrative agency's placing into effect the policy declared by the General Assembly in the statutes to be administered by the agency. In other words, administrative agency rules are an administrative means for the accomplishment of a legislative end. * * *" *Id.* at 110, 10 OBR at 133, 460 N.E.2d at 706.

*Carroll* set forth the test for determining the validity of administrative rules, stating that "the director may not issue rules which are unreasonable or are in clear conflict with statutory enactments covering the same subject matter[,]" nor

may the director "promulgate rules which add to his delegated powers, no matter how laudable or sensible the ends sought to be accomplished." *Id.*

Applying *Carroll* to these facts, it must be determined whether subsections (C), (I), (J) and (K) of Ohio Adm.Code 153:1–1–05 and Ohio Adm.Code 153:2–1–05 (1) are unreasonable; (2) are in clear conflict with the relevant statutory enactments; or (3) add to the delegated powers of the directors of ODAS and ODOT.

Although the trial court did not expressly refer to *Carroll,* the court did consider whether the use of fee proposals to break a tie between equally qualified professional design firms was blatantly offensive to R.C. Chapter 153 or frustrated the legal purpose behind enactment of the relevant statutes. Thus, the court implicitly addressed whether the rules are unreasonable, clearly conflict with R.C. Chapter 153, or add to the delegated powers of ODAS and ODOT directors.

Appellants essentially raise two bases for their assertion that the rules are an impermissible exercise of rulemaking authority: (1) that the rules facially conflict with R.C. 153.69; (2) that, in practice, the rules will thwart the legislative intent and public policy underlying the enactment of R.C. 153.69.

Arguing that the rules contravene R.C. 153.69, appellants point to language in R.C. 153.65(D), indicating that the determination of the qualifications of a firm will be based upon consideration of the firm's competence, technical capability and experience. The trial court found that the fee proposals permitted under the rules are only to be sought after the agency has followed R.C. 153.69 and is unable to differentiate between two or more equally qualified firms. This is not an unreasonable method of breaking a tie and addresses a situation which R.C. 153.69 did not anticipate, rendering the rules facially compliant with the statutory guidelines and not improperly adding to the delegated powers of ODAS and ODOT directors, to whom the statute grants the discretion to determine the most qualified firm.

Appellants also contend that, in practice, the rules will violate the legislature's intention in enacting R.C. 153.69, which was to remove competitive bidding from the determination of whether a firm is qualified. While the rules do inject some degree of economic consideration into the agencies' decision-making process, the legislative intent is not frustrated by this practice, post-cost control being one of the statutory factors. While the rules provide for submission of fee proposals to break a tie where more than one firm is found to be equally qualified, this is not a competitive bid. The fee proposal does not become the contract price but, rather, as provided in the rules, a contract is later negotiated for a fair and reasonable compensation with the firm finally found to be most qualified as required by R.C. 153.69(B). Ohio Adm.Code 153:1–1–05 and 2–1–05 simply provide the procedure for determining what firm or firms meet the qualification definition contained in R.C. 153.65(D). In theory, there may be several equally qualified firms, but R.C.

153.69 does not indicate how to break the tie. Initially determining the most qualified firms before allowing fee proposals would protect the legislative interest in preventing economic considerations from taking priority, since unqualified or lesser qualified firms would not be permitted to submit sealed fee proposals.

Appellants suggest ODAS and ODOT will use the rules to manufacture ties[1] between professional design firms in an effort to implement competitive bidding where statutorily they would not be permitted to do so. However, in this matter, appellants do not allege a specific incident in which the agencies misapplied the rules but, rather, generally contend that the rules leave room for a potential misapplication. In the absence of a showing of such misapplication, this court may not review whether the agencies' application of the rules would defeat the statute's·purpose, only whether the rules, on their face, facilitate the agencies in carrying out the legislative policy underlying R.C. 153.69.

Appellants additionally argue that application of the rationale behind comparable federal legislation, upon which the General Assembly apparently relied in adopting R.C. Chapter 153, indicates that the legislature meant to prohibit any suggestion of cost at any time prior to selection of one qualified firm for the public works contract. On this point, appellants essentially argue that the General Assembly did not intend these rules to go into effect; however, the legislative history of the rules indicates that, had both houses of the legislature wished to prevent adoption of these rules, the Senate would have voted to adopt the concurrent resolution invalidating the proposed rules. We can only conclude that the legislative intent was for these rules to remain in effect. If the consideration of a fee proposal to determine the most qualified firm is contrary to the intent of the legislature, R.C. 153.69 could be amended to so state.

Finally, appellants assert that allowing any type of competitive bidding, including fee proposals, would encourage contractors to cut corners, resulting in substandard and hazardous construction. Other than generally referencing the collapse of several public and private structures in other states, appellants offer no real evidence that provision for fee proposals in these rules will result in construction disasters.

The rules in question meet the requirements set forth in *Carroll.* Thus, the trial court did not err in granting summary judgment to appellees, who were entitled to prevail as a matter of law. Appellants' first assignment of error is overruled.

---

1. Despite the reference in the dissent, this is a contention of appellants not an admission of the agencies. The issue is facial validity while this argument raises an issue of possible misapplication by the agencies which would violate the rule as well as the statute.

Appellants' second and third assignments of error raise issue with the trial court's decision to issue a protective order and the court's refusal to review the propriety of the Governor's declaration of an emergency. These assignments address the protection and scope of the Governor's authority to issue emergency orders.

According to appellants, the Governor did not follow the proper procedures for issuing an emergency order, since there had been no written request for an emergency order and since the Governor never indicated the basis for concluding that a state of emergency existed. Appellants additionally claim that the protective order prevented them from discovering evidence which would have shown the Governor lacked a reason to declare an emergency and thus abused his discretion. Had appellants initiated their action within the original ninety days in which the emergency order was in effect, the discretion of the Governor to issue such order might arguably have been subject to judicial review; however, once the rules became subject to the legislative and administrative rulemaking process, any possible abuse of discretion on the part of the Governor in signing the emergency order was irrelevant. Thus, any error by the trial court in granting the protective order was harmless.

Appellants' second and third assignments of error are overruled.

Appellants' first, second and third assignments of error are overruled, and the summary judgment granted by the trial court is affirmed.

*Judgment affirmed.*

WHITESIDE, J., concurs.

BRYANT, J., dissents.

PEGGY BRYANT, Judge, dissenting.

Being unable to agree with the majority's disposition of appellants' first assignment of error, I respectfully dissent.

Pursuant to R.C. 153.69, each agency planning to contract for professional design services is to evaluate the statements of qualifications of the professional design firms currently on file, together with those submitted by other professional design firms specifically regarding the planned project; the agency is to hold discussions with the individual firms to explore further the firm's statements of qualifications, the scope and nature of the services the firm would provide and the various technical approaches the firm may take toward the project. Pursuant to R.C. 153.65(D), "qualifications" means competence of the professional design firm as set forth in R.C. 153.65(D)(1), the ability of the firm in terms of its work and availability of qualified personnel, equipment, and facilities as set forth in R.C.

153.65(D)(2), past performance of the firm as set forth in R.C. 153.65(D)(3), and other similar factors.

Following the evaluation required under R.C. 153.69, the agency is to select and rank no fewer than three firms it considers to be the most qualified to provide the required professional services; and it is to negotiate a contract with the firm ranked most qualified for the required services. In the event the agency is unable to negotiate a contract pursuant to R.C. 153.69(B) through (D), the agency is to select and rank additional firms, based on their qualifications; negotiations are to continue with the firm selected and ranked until a contract is negotiated.

The foregoing statutes require that, based on an evaluation of qualifications as defined in R.C. 153.65, the agency select and rank the most qualified firms. "To rank" is defined as "to determine the relative position or merit of." Webster's Third New International Dictionary (1966) 1881. The clear intent of R.C. 153.69, then, is to determine the relative merits of the various firms and to "negotiate a contract with *the* firm ranked most qualified to perform the required services." (Emphasis added.) R.C. 153.69(B). The statute does not contemplate nor allow the agency to rank more than one firm as the most qualified; nor does it contemplate or allow competitive bidding to replace the agency's required duty of ranking the firms and selecting the most qualified firm.

By contrast, although the rules in question state that the agency is to select and rank the firms, the rules allow the agency to abdicate its responsibility to rank the firms, instead relegating that duty to the competitive bidding process. Indeed, as the trial court noted, the agencies involved "admittedly expect ties to be the norm rather than the exception." Hence, rather than simply provide a tie-breaking mechanism for a situation not contemplated by the statute, the rules legislate in direct contradiction of the relevant statutes. Accordingly, under *Carroll v. Dept. of Adm. Serv.* (1983), 10 Ohio App.3d 108, 10 OBR 132, 460 N.E.2d 704, the rules are more than "an administrative means for the accomplishment of the legislative end," and they must be declared facially invalid.

Indeed, the present case illustrates the inherent danger in allowing administrative rules to legislate beyond statutory parameters. The Ohio General Assembly passed R.C. 153.65 *et seq.* to provide a means for selecting professional firms under the designated circumstances. If the executive branch wanted to change those statutes legislatively, it would require the affirmative action of both chambers of the General Assembly. By contrast, the present rules were promulgated first as emergency provisions under Executive Order, and ultimately as permanent rules. However, after a public hearing, the Joint Committee on Agency Rule Review recommended that the rules not be approved, and that the General Assembly adopt a current resolution invalidating the rules. While one

chamber of the General Assembly so voted, the other chamber refused to vote on the resolution. The resolution thus failed and the rules remain in effect. As a result, the executive branch has been able to accomplish through administrative rules that which the General Assembly chose not to enact.

While the intent of the executive branch in inserting competitive bidding into the process may have merit, the General Assembly decided, for whatever reason, to provide other means for selecting the firms to contract with agencies under the statute. The administrative rules may not change that process. Inasmuch as these rules do precisely that, they are invalid. Accordingly, I would sustain appellants' first assignment of error, reverse the judgment of the trial court, and remand with instructions to enter judgment in favor of appellants.